## ALLEN V. DESENA *v*. CITY OF WATERBURY
## (SC 15980)

Callahan, C. J., and Borden, Berdon, Katz, Palmer, McDonald and Peters, Js.

---

Argued February 16—officially released June 1, 1999

*Charles E. Oman III*, assistant corporation counsel, for the appellant (defendant).

*Anthony O. Famiglietti,* for the appellee (plaintiff).

*Mary-Michelle U. Hirschoff* filed a brief for the Connecticut Conference of Municipalities as amicus curiae.

*Opinion*

KATZ, J. At the time of the circumstances that gave rise to this appeal, General Statutes (Rev. to 1995) § 12-62[1] required, inter alia, municipal assessors to conduct

[1] General Statutes (Rev. to 1995) § 12-62 provides in relevant part: "(a) Commencing October 1, 1993, the assessors of all towns, consolidated towns and cities and consolidated towns and boroughs shall, no later than ten years following the effective date of the last preceding revaluation of all real property and every ten years thereafter, revalue all of the real estate in their respective municipalities for assessment purposes, in accordance with the provisions of subsection (b) of this section. The assessments derived from each such revaluation shall be used for the purpose of levying property taxes in such municipality in the assessment year in which such revaluation becomes effective and in each assessment year thereafter until the next succeeding revaluation in accordance with this section becomes effective. In the performance of these duties, except in any municipality where there is a single assessor, at least two of the assessors shall act together, and all valuations shall be separately approved by a majority of the assessors.

"(b) In conducting a revaluation in accordance with this section, the assessor shall be required to view by physical observation all real estate in the municipality, provided if such real estate has been so viewed and revalued within a period not exceeding five years immediately preceding the effective date of such revaluation, the assessor may conduct such revaluation by use of a statistical method of adjusting the value, without such viewing, reflecting any change in the value of such real estate as compared to its value determined for purposes of said immediately preceding revaluation in accordance with this section. Any municipality in which, on July 1, 1989, the effective date of the last preceding revaluation exceeds five years from such date, such municipality may conduct a revaluation by use of a statistical method which is effective for any assessment year commencing not later than five years after July 1, 1989. Any municipality which commences revaluations by use of a statistical method within a period not exceeding five years immediately following the effective date of a revaluation by physical observation may annually conduct such a revaluation by use of a statistical method in each of the succeeding years between revaluations, provided if a municipality fails to conduct a revaluation by use of a statistical method, in any year after commencing such revaluations by use of a statistical method it shall not conduct any further revaluations by use of a statistical method until a revaluation by viewing has been conducted. Nothing in this subsection shall be construed to extend the period between revaluations made by

revaluations, for taxation purposes, of all of the real property in their respective municipalities on a decennial basis.[2] Although the statutory revaluation scheme provides for only two limited circumstances under which an interim revaluation is mandated; see footnotes 14 and 15 of this opinion; the plaintiff, Allen V. DeSena, asserts that certain language in this court's opinion in *Ralston Purina Co.* v. *Board of Tax Review*, 203 Conn. 425, 435–36, 525 A.2d 91 (1987), served as a judicial recognition of additional special circumstances that compelled the defendant, the city of Waterbury, to conduct an interim revaluation. The principal issue in this appeal is whether these additional special circumstances can be relied upon as the basis for a mandatory interim revaluation. We conclude that they cannot.

Additionally, this appeal requires us to consider whether General Statutes (Rev. to 1995) § 12-55,[3] which

viewing beyond ten years. The secretary of the office of policy and management shall adopt regulations concerning acceptable methods for use by a municipality in conducting a revaluation by use of statistical adjustments in value. . . ."

[2] Section 12-62 has been amended numerous times since its enactment. Most of these amendments are not relevant to this appeal. We note, however, that although the statutes permit periodic revaluations by a statistical method under the appropriate circumstances, as opposed to revaluation by physical viewing, such statistical revaluations are not at issue in this case.

Additionally, it should be noted that No. 95-283, § 3, of the 1995 Public Acts increased the length of time permitted between revaluations conducted by physical viewing from ten to twelve years. Because the events underlying this appeal occurred when the statute required revaluation decennially, however, this opinion discusses the statutory revaluation scheme as of that time.

[3] General Statutes (Rev. to 1995) § 12-55 provides: "Lists; notice of increase; public inspection; abstracts. (a) When the lists of any town have been so received or made by the assessor or board of assessors, they shall equalize the same, if necessary, and make any assessment omitted by mistake or required by law. The assessor or board of assessors may increase or decrease the valuation of property as named in any of such lists or in the last-preceding grand list, but, in each case of any increase in valuation of such property above the valuation, if any, stated by the person filing such list or in each case of any increase of valuation above the valuation of such property in the last-preceding grand list, except with respect to the valuation

permits municipal assessors to make adjustments to assessment values of real property in order to equalize the tax lists under certain conditions, *compels* the defendant's assessor to make such adjustments. We conclude that it does not.

The record reveals the following facts. In 1980, as part of a decennial revaluation required by § 12-62; see footnote 1 of this opinion; the defendant's assessor assessed real property located at 21 Cliff Street in Waterbury (property). On the property were two buildings: a three car garage, and a building of approximately 8153 square feet that had previously been used as a convalescent hospital. The property's assessed value on the grand list of October 1, 1980, was $406,000, a valuation that was based on a fair market value of $580,000.

of any motor vehicle, they shall send written notice by mail of such increase in accordance with subsection (b) of this section, including in such notice the valuation prior to and after such increase with respect to each parcel of real property or any improvement thereon, the valuation of which has been increased, to the last-known address of the person whose list or valuation is so changed. When such lists have been so completed, the assessor or board of assessors shall arrange such lists in alphabetical order and lodge the same, except as otherwise specially provided by law, in the town clerk's or assessors' office, on or before the thirty-first day of January, for public inspection. Such assessor or board of assessors shall make an abstract of such lists, including the twenty-five per cent added thereto, shall take and subscribe the oath provided by law, which shall be certified by the officer administering the same and endorsed upon or attached to such abstract, and, except as otherwise specially provided by law, shall lodge such abstract in the town clerk's office, on or before the thirty-first day of January next after the date prescribed for the filing of such lists, for public inspection. Any assessor or board of assessors of any town who fails to comply with any provision of this section shall be fined five dollars.

"(b) The written notice of assessment increase as required in subsection (a) of this section shall be mailed on or before the tenth day immediately following the date on which the grand list abstract is signed and attested to by the assessor or board of assessors. If such assessment increase notice is sent later than the time period herein prescribed, such increase shall become effective on the next succeeding grand list."

In July, 1987, the plaintiff, who had been a nursing home administrator for twenty-five years, purchased the property. At that time, the larger of the buildings on the property was licensed by the state as a skilled nursing facility. When the plaintiff purchased the property, he was "grandfathered" into provisions of state law that allowed him to operate a skilled nursing facility at the property in its then current condition.[4]

In 1992 or 1993, the plaintiff began efforts to sell the business on the property. At that time, he was leasing the property to an operating entity, Mattatuck Extended Care Facility, of which the plaintiff was owner, chief administrator and an officer. Under the terms of the lease agreement, the plaintiff received a monthly rent of $19,000, which, according to the plaintiff, was based upon his monthly mortgage payment obligation of approximately $10,000.

The plaintiff testified that his decision to sell the business was based on "market conditions" that had "slowly developed" since 1987.[5] The plaintiff's efforts to sell the business were unsuccessful until 1995, when the state passed legislation that allowed him to sell the facility's license to a buyer who would be free to use the license at another physical location.[6] On March 31,

---

[4] The plaintiff testified that the state ordinarily requires an inspection when a change of ownership occurs.

[5] The plaintiff testified that among the factors that led to his decision to sell his business were the increasing difficulty in competing at the skilled nursing care level, the need for skilled labor, the need for costly renovations, and the then recent construction of an eighty bed residential care facility in downtown Waterbury.

[6] General Statutes § 17b-354 provides in relevant part: "Requests for additional nursing home beds. Continuing care facility. Construction. Financing. Regulations. (a) Except for applications deemed complete as of August 9, 1991, the Department of Social Services shall not accept or approve any requests for additional nursing home beds or modify the capital cost of any prior approval for the period from September 4, 1991, through June 30, 2002, except . . . (3) Medicaid certified beds to be relocated from one licensed nursing facility to another licensed nursing facility, provided (A) the availability of beds in an area of need will not be adversely affected;

1996, the plaintiff entered into a termination agreement in which he agreed to sell the property and its license to Athena Health Care (Athena), another nursing home operator, for $1,650,000. As part of the transaction, the plaintiff took back a mortgage on the property in the amount of $150,000. With a portion of the proceeds, the plaintiff paid off the preexisting mortgage on the property, which totaled in excess of $1,000,000. Thereafter, Athena's mortgage went into default and the plaintiff foreclosed in 1996. As a result of the foreclosure judgment, title vested once again in the plaintiff. Although the plaintiff thereby became the owner of the property, he did not reacquire the license that would permit a skilled nursing facility to be operated on the premises.[7]

Since reacquiring the property through foreclosure, the plaintiff has tried unsuccessfully to sell it. Each year, from 1987 through 1995, the defendant's assessor determined the assessed value of the property to be $406,000, the assessed value placed on the property in the 1980 revaluation. The plaintiff estimated, however, that the value of the property was below $150,000, and his appraiser valued it at $80,000 as of March 18, 1997. The plaintiff's appraiser based his appraisal on the property's "highest and best use compatible with its surroundings," that of a multifamily residence.

The plaintiff appealed the 1995 and 1996 assessments to the defendant's board of assessment appeals, which denied his appeal on April 22, 1997. Pursuant to General

---

(B) no such relocation shall result in an increase in state expenditures; and (C) the relocation results in a reduction in the number of nursing facility beds in the state. . . ."

[7] The plaintiff testified that the facility could not be operated as a skilled nursing facility because the state has a moratorium on licensing such facilities until the year 2004. The moratorium actually runs until the year 2002. See the relevant text of § 17b-354 (a) in footnote 6 of this opinion.

Statutes § 12-117a,[8] the plaintiff appealed from the

[8] General Statutes § 12-117a provides: "Appeals from boards of tax review or boards of assessment appeals. Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review or the board of assessment appeals, as the case may be, in any town or city may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom, with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, October 1, 1994, or October 1, 1995, and with respect to the assessment list for assessment years thereafter, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. Such citation shall be signed by the same authority and such appeal shall be returnable at the same time and served and returned in the same manner as is required in case of a summons in a civil action. The authority issuing the citation shall take from the applicant a bond or recognizance to such town or city, with surety, to prosecute the application to effect and to comply with and conform to the orders and decrees of the court in the premises. Any such application shall be a preferred case, to be heard, unless good cause appears to the contrary, at the first session, by the court or by a committee appointed by the court. The pendency of such application shall not suspend an action by such town or city to collect not more than seventy-five per cent of the tax so assessed or not more than ninety per cent of such tax with respect to any real property for which the assessed value is five hundred thousand dollars or more, and upon which such appeal is taken. If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year and such applicant need not appear before the board of tax review or board of assessment appeals, as the case may be, to make such amendment effective. The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review or board of assessment appeals, as the case may be, is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and any costs awarded by the court, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and any costs awarded by the court. Upon motion, said court shall, in event of such overpayment, enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and any costs

board's decision to the trial court, claiming that the assessments were "greatly excessive, disproportionate and unlawful." According to the trial court, the testimony presented at trial was a "battle of the experts," with the plaintiff's appraiser testifying that the property's fair market value was $80,000, which would amount to an assessed value of $56,000, and the defendant's appraiser testifying that the then current assessment was based on the 1980 figures for fair market value and assessed value, which, according to the defendant's appraiser, were "in the ballpark."

In its memorandum of decision, issued May 7, 1998, the trial court acknowledged this court's holding in *Ralston Purina Co.* v. *Board of Tax Review*, supra, 203 Conn. 441, that a taxpayer is not entitled to a revaluation of property between decennial revaluations based solely upon fluctuations in market conditions. According to the trial court, however, "the issue as to whether real estate assessments can be adjusted in interim years between decennial evaluations was answered in the affirmative in *Ralston [Purina Co.]* . . . ." Undoubtedly relying on language in *Ralston Purina Co.* that stated that "the defendant concedes that, under certain circumstances, such as the destruction or expansion of property, a substantial change in its use or zoning classification, or a decision by the taxpayer to go out of business, it would be required to conduct an interim revaluation of property"; id., 435–36; the trial court regarded these special circumstances as supporting interim relief. The court then determined that the present case fell under two of the three exceptions set forth in *Ralston Purina Co.*—that is, a substantial change in the use of the property, and the taxpayer's

awarded by the court. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

decision to go out of business. Accordingly, the court ruled in favor of the plaintiff with respect to the grand list of 1996, reducing the assessed value of the property from $406,000 to $56,000.[9] The defendant appealed to the Appellate Court from the judgment of the trial court and, pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c), we transferred the appeal to this court.

The defendant makes two claims on appeal. First, it claims that the trial court improperly relied on dictum in our opinion in *Ralston Purina Co.* v. *Board of Tax Review,* supra, 203 Conn. 435–36. Specifically, the defendant asserts that the special circumstances mentioned therein were not part of the court's holding and, therefore, are not recognized exceptions to § 12-62. Second, the defendant argues that § 12-55 is permissive rather than mandatory and, therefore, may not be used to compel the assessor to make an interim revaluation. We agree with the defendant.[10] Accordingly, we reverse the judgment of the trial court.

I

Before considering the merits of the parties' arguments, we set forth the applicable standard of review. "The scope of our appellate review depends upon the

[9] Because these special circumstances did not arise until 1996, the trial court denied the plaintiff's requested relief for the 1995 tax year.

[10] In addition to responding to the defendant's claims on the merits, the plaintiff argues that this court should not consider either of the defendant's claims because, according to the plaintiff, they were neither distinctly raised at trial nor did they arise subsequent to the trial. See Practice Book § 60-5. The plaintiff asserts that the defendant did not claim as a special defense that interim revaluation was unavailable to the plaintiff. We note, however, that the burden of proof at the trial was on the plaintiff; *Somers* v. *LeVasseur,* 230 Conn. 560, 568, 645 A.2d 993 (1994), citing *Silva* v. *Hartford,* 141 Conn. 126, 129, 104 A.2d 210 (1954); and the defendant had no obligation to plead such a special defense. Moreover, because the trial court specifically addressed the issue of whether interim revaluation was an appropriate relief for the plaintiff, the plaintiff had a fair opportunity to present his argument. The defendant, therefore, is not precluded from advancing arguments on this issue on appeal.

proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. Practice Book § [60-5]; *United Illuminating Co.* v. *Groppo*, 220 Conn. 749, 752, 601 A.2d 1005 (1992); *Zachs* v. *Groppo*, 207 Conn. 683, 689, 542 A.2d 1145 (1988); *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980)." (Internal quotation marks omitted.) *SLI International Corp.* v. *Crystal*, 236 Conn. 156, 163, 671 A.2d 813 (1996). In this case, the trial court made conclusions of law based upon its interpretation of this court's precedent. Our review, therefore, is plenary.

## II

### A

The defendant first claims that the trial court improperly concluded that the plaintiff was entitled to an interim revaluation of the property in accordance with dictum contained in *Ralston Purina Co.* v. *Board of Tax Review*, supra, 203 Conn. 435–36. In contrast, the plaintiff argues that the language at issue in *Ralston Purina Co.*, although dictum, was a judicial recognition of nonstatutory special circumstances that can serve as a basis for compelling an interim revaluation of property, and, therefore, the trial court acted properly in relying on *Ralston Purina Co.* in its holding. We agree with the defendant.[11]

---

[11] The *Ralston Purina Co.* dictum lists the statutorily recognized circumstances for interim revaluation, as well as other nonstatutory circumstances. *Ralston Purina Co.* v. *Board of Tax Review*, supra, 203 Conn. 435–36. We note, however, that because the only nonstatutory special circumstances at issue in this case are a substantial change in the use of the property and a decision by the taxpayer to go out of business, we do not consider in this opinion the remaining circumstance that appears in the dictum—that is, a substantial change in the property's zoning classification.

Before turning our attention to the specific language at issue in *Ralston Purina Co.*, however, it is instructive to examine the statutory scheme regarding revaluations of property, as well as the relevant case law interpreting the statutes. As we noted in *Jupiter Realty Co.* v. *Board of Tax Review*, 242 Conn. 363, 369, 698 A.2d 312 (1997), § 12-62 "originally was enacted as Public Acts 1917, c. 214, in substantially the same form as it exists today in § 12-62.[12] Because of the year of its enactment, [however] we have no legislative history for Public Acts 1917, c. 214."

From its inception in 1917, until its amendment in 1995,[13] § 12-62 provided that town assessors were required, no later than ten years after the last preceding revaluation, to view all of the real estate in their respective municipalities and to revalue it for assessment. As we stated in *Uniroyal, Inc.* v. *Board of Tax Review*, 182 Conn. 619, 629, 438 A.2d 782 (1981), "[t]he remedy of revaluation was established by the legislature and it was the judgment of the legislature that the remedy need only be available once each decade."

The legislature has also provided, however, for required revaluations in the interim years between decennial revaluations in very limited circumstances. The only circumstances provided by statute that *require* an assessor to conduct an interim revaluation of a property are: (1) damage to a property requiring complete

[12] Public Acts 1917, c. 214, provided: "The assessors of all towns, consolidated towns and cities, and consolidated towns and boroughs, unless otherwise provided, shall, on or before February 1, 1920, and during each period of ten years thereafter, view all of the real estate of their respective municipalities, and shall revalue the same for assessment, and in the performance of these duties at least two of the assessors shall act together and all valuations shall be separately approved by a majority of the assessors."

[13] As noted in footnote 2 of this opinion, No. 95-283, § 3, of the 1995 Public Acts increased the length of time permitted between physical revaluations of property from ten to twelve years.

demolition or total reconstruction; General Statutes § 12-64a;[14] and (2) new construction completed on the property. General Statutes § 12-53a.[15]

We have expressly rejected the argument that changes in property value resulting from market conditions constitute a sufficient basis upon which a taxpayer

[14] General Statutes § 12-64a provides: "Reduction in assessed value of real estate upon removal of damaged buildings. (a) Whenever a building is so damaged as to require total reconstruction before it may be used for any purpose related to its use prior to such damage and following which, the owner provides for complete demolition of such building with the material from demolition being removed from the parcel of real property on which the building was situated or used as fill on such parcel for purposes of grading, such parcel shall be assessed for purposes of property tax as of the date such demolition, removal and grading are completed, to the satisfaction of the building inspector in the municipality, and such assessment shall reflect a determination of the assessed value of such parcel, exclusive of the value of the building so damaged, demolished and removed. The adjusted assessment shall be applicable with respect to such parcel from the date demolition, removal and grading are completed, as determined by said building inspector, until the first day of October next succeeding and the amount of property tax payable with respect to such parcel for the assessment year in which demolition, removal and grading are completed shall be adjusted accordingly in such manner as determined by the assessor.

"(b) Notwithstanding the provisions of subsection (a) of this section, in the case of a building that sustains fire or weather-related damage that requires the building to be totally reconstructed before it may be used for any purpose related to its use prior to the damage, the assessment reduction shall be calculated from the date of such fire or weather event if the owner, within one hundred twenty days of the fire or weather event, provides for complete demolition of such building with the material from demolition being removed from the parcel of real property on which the building was situated and the parcel graded to the satisfaction of the building inspector in the municipality. If the fire or weather event occurs not more than one hundred twenty days before the next assessment date and the owner provides for such complete demolition, removal and grading to the satisfaction of the building inspector after the next assessment date and not more than one hundred twenty days after the fire or weather event, the assessment for the damaged building shall be removed for such next assessment date."

[15] General Statutes § 12-53a provides: "Assessment and taxation of new real estate construction. (a) Completed new construction of real estate completed after any assessment date shall be liable for the payment of municipal taxes from the date the certificate of occupancy is issued or the date on which such new construction is first used for the purpose for which

may compel an interim revaluation of property. "We held in [*Uniroyal, Inc.*] that the decennial revaluation

same was constructed, whichever is the earlier, prorated for the assessment year in which the new construction is completed. Said prorated tax shall be computed on the basis of the rate of tax applicable with respect to such property, including the applicable rate of tax in any tax district in which such property is subject to tax following completion of such new construction, on the date such property becomes liable for such prorated tax in accordance with this section.

"(b) The building inspector issuing the certificate shall, within ten days after issuing the same, notify, in writing, the assessor of the town in which the property is situated.

"(c) Not later than ninety days after receipt by the assessor of such notice from the building inspector or from a determination by the assessor that such new construction is being used for the purpose for which same was constructed, the assessor shall determine the increment by which assessment for the completed construction exceeds the assessment on the taxable grand list for the immediately preceding assessment date. He shall prorate such amount from the date of issuance of the certificate of occupancy or the date on which such new construction was first used for the purpose for which same was constructed, as the case may be, to the assessment date immediately following and shall add said increment as so prorated to the taxable grand list for the immediately preceding assessment date and shall within five days notify the record owner as appearing on such grand list and the tax collector of the municipality of such additional assessment. Such notice shall include information describing the manner in which an appeal may be filed with the board of assessment appeals. Notwithstanding the provisions of this subsection, for new construction completed after October first but before February first in any assessment year, the assessor shall, not later than ninety days after completion of the duties of the board of assessment appeals, determine the increment in accordance with this subsection.

"(d) Any person claiming to be aggrieved by the action of the assessor hereunder may appeal the doings of the assessor to the board of assessment appeals and the Superior Court as otherwise provided in this chapter; provided such appeal shall be extended in time to the next succeeding board of assessment appeals, if the statutory period for the meeting of such board has passed. Any person, intending to so appeal, may indicate that taxes paid by him upon the prorated increment herein specified during the pendency of such appeal are paid 'Under Protest' and thereupon he shall not be liable for any interest on the taxes based upon such prorated increment, provided he shall have paid not less than seventy-five per cent of the amount of such taxes within the time specified.

"(e) Upon receipt of such notice from the assessor, the tax collector of the town shall, if such notice is received after the normal billing date, within thirty days thereafter mail or hand a bill to the owner based upon an amount prorated by the assessor. Such tax shall be due and payable and collectible

of real property mandated by § 12-62 is the exclusive remedy provided by the legislature 'for variations in the effect of market conditions on different parcels . . . .' " *Ralston Purina Co.* v. *Board of Tax Review*, supra, 203 Conn. 437, quoting *Uniroyal, Inc.* v. *Board of Tax Review*, supra, 182 Conn. 629.

In *Ralston Purina Co.* v. *Board of Tax Review*, supra, 203 Conn. 438–39, we again held that assessors are not required to conduct interim revaluations of property in response to changes in market conditions. Although the holding in *Ralston Purina Co.* was so limited, the plaintiff argues that there exists language in that opinion that recognizes three special circumstances that would allow a taxpayer to compel assessors to conduct an interim revaluation of his or her property. This language was, in fact, the foundation upon which the trial court constructed its holding and serves as the linchpin of the plaintiff's argument. The question becomes, therefore, whether the dictum in *Ralston Purina Co.* introduced into our case law judicial exceptions to the rule that assessors are not required to conduct interim revaluations except under the limited circumstances provided for by statute. After examining the language and its purpose in this court's opinion in *Ralston Purina Co.*, we conclude that it was not.

---

as other municipal taxes and subject to the same liens and processes of collection; provided such tax shall be due and payable in an initial or single instalment due and payable not sooner than thirty days after the date such bill is mailed or handed to the owner, and in any remaining, regular installments, as the same are due and payable, and the several installments of a tax so due and payable shall be equal.

"(f) Nothing herein shall be deemed to authorize the collection of taxes twice in respect of the land upon which the new construction is located."

It is noteworthy, however, that even a revaluation pursuant to this statute is not a true interim revaluation as the assessor is required to add any change in the property's value, after proration, "to the taxable grand list for the immediately preceding assessment . . . ." General Statutes § 12-53a (c). In other words, the change in the property's assessed value relates back to the preceding decennial revaluation. See *Newbury Commons Ltd. Partnership* v. *Stamford*, 226 Conn. 92, 102–103, 626 A.2d 1292 (1993).

At the outset of the *Ralston Purina Co.* opinion, the court provided the relevant facts of the case, a recitation of its procedural history, and a brief discussion of the pertinent statutory sections. Thereafter, prior to embarking upon our analysis of the issues presented, the court summarized the parties claims and arguments. Id., 426–35. In that context, after reciting the defendant's first claim of error, the court stated that, "*[a]ccording to the defendant,* it may be required to conduct . . . interim revaluations of real property in certain limited circumstances, *but this case does not present such circumstances.*" (Emphasis added.) Id., 433. At the end of its summary of the defendant's argument on this issue, the court added: "Furthermore, although the defendant *concedes* that, under certain circumstances, such as the destruction or expansion of property, a substantial change in its use or zoning classification, or a decision by the taxpayer to go out of business, it would be required to conduct an interim revaluation of property, it contends that none of those circumstances exists in the present case." (Emphasis added.) Id., 435–36. Although both parties agree that this language is dictum,[16] they disagree as to its precedential effect. Finally, immediately following this language, the court set forth the plaintiff's arguments.

The facts of *Ralston Purina Co.* did not involve any of the special circumstances that the court mentioned in dictum. Rather, the dispositive issue as framed by this court in that case was "whether a municipality

---

[16] Black's Law Dictionary (6th Ed. 1990), defines "dictum" as "an observation or remark made by a judge in pronouncing an opinion upon a cause, concerning some rule, principle, or application of law, or the solution of a question suggested by the case at bar, but not necessarily involved in the case or essential to its determination; any statement of the law enunciated by the court merely by way of illustration, argument, analogy, or suggestion. Statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand are obiter dicta, and lack the force of an adjudication. . . ."

is required under . . . § 12-62 to adjust property tax assessments during interim years between decennial revaluations of real property to account for fluctuations in property values *resulting solely from changes in market conditions.*"[17] (Emphasis added.) Id., 426. Therefore, this court did not consider whether the nonstatutory special circumstances we listed as part of the defendant's concession could properly serve as the basis for compelling a town's assessor to conduct an interim revaluation of property.

A reading of the *Ralston Purina Co.* opinion makes clear that the language at issue was merely a recounting of a concession made by the defendant on issues that were not involved in the case. An examination of the record and briefs in that case reveals the path by which the nonstatutory special circumstances mentioned in *Ralston Purina Co.* traveled to finally arrive in the form of dictum in our opinion.

In its appellate brief, the defendant in *Ralston Purina Co.* stated that "[e]vidence of changes in value resulting from purely market forces, as opposed to physical changes to the property itself, its use, zoning or other laws governing the property, is relevant at times of decennial revaluation but not during the interim years. See *Lerner Shops of Connecticut, Inc.* [v. *Waterbury*, 151 Conn. 79, 87–88, 193 A.2d 472 (1963)] (applying average ratio of evidence to reduce plaintiff's assessment in view of failure to properly conduct *general*

---

[17] In *Ralston Purina Co.*, the plaintiffs had claimed that the fair market value of their property, a mushroom farm, had declined substantially since the most recent decennial revaluation conducted by the town's assessor, as evidenced by the subsequent sale of the farm at a price well below its assessed value. *Ralston Purina Co.* v. *Board of Tax Review*, supra, 203 Conn. 431. According to the plaintiffs, the decline of the property's fair market value was "[d]ue to increased competition from out-of-state mushroom growers . . . ." Id., 430. Therefore, whether there had been a physical change in the property, such as a destruction or expansion of property, or a substantial change in the property's use or zoning classification, or, finally, a decision by the taxpayer to go out of business, was not at issue in that case.

*revaluation*). Accord *Kays, Inc.* [v. *Board of Tax Review*, 170 Conn. 477, 481, 365 A.2d 1207 (1976)] (evidence of ratio of assessed value of property to market value could be utilized to demonstrate failure to assess property at valuation as of time of previous *general revaluation*)." (Emphasis in original.) Although the cases cited by the defendant may have supported its general argument that evidence of market fluctuations is not relevant during the interim years between decennial revaluations, they made no mention of any of the special circumstances that would, in the opinion of the defendant in *Ralston Purina Co.*, be relevant.[18]

Additionally, the defendant in *Ralston Purina Co.* asserted that the purported exceptions to § 12-62 contained in its concession comported with the practice and policy of other jurisdictions with similar statutes. Specifically, the defendant cited six statutes that omit market forces from their list of factors to be weighed in assessments during interim years. Although at the time of the events that gave rise to *Ralston Purina Co.* some of those statutes listed circumstances that are legislatively recognized in Connecticut as requiring interim revaluations, such as demolition of, or damage to, property; General Statutes § 12-64a; and construction on the property; General Statutes § 12-53a; only

---

[18] *Lerner Shops of Connecticut, Inc.* v. *Waterbury*, supra, 151 Conn. 86, involved an improper assessment of fair market value, unrelated to the nonstatutory special circumstances; and in *Kays, Inc.* v. *Board of Tax Review*, supra, 170 Conn. 479, although the plaintiff admitted that the value of the subject property, as reduced by the trial court, accurately represented the property's true market value, he claimed that the court's assessment was still disproportionate when compared to the assessed values of other properties located in the same city. Neither case involved a substantial change in use or zoning classification, a decision by the taxpayer to go out of business, or even the statutorily recognized circumstances regarding damage to the property or new construction on the property, both of which precipitate mandatory revaluation in interim years.

two specifically listed rezoning,[19] and none referred specifically to changes in use.

Finally, we note that the cases from other states cited by the defendant in *Ralston Purina Co.* for support involved only changes due to market fluctuations and did not involve any of the special circumstances that appeared in the defendant's concession.[20] It is evident, therefore, that there was no basis in Connecticut's case law for the recognition of the nonstatutory special circumstances enumerated in the defendant's concession in *Ralston Purina Co.*, and no support for the existence of such circumstances in the case law or statutes of other states relied upon by the defendant.

[19] See Ind. Code Ann. § 6-1.1-4-12 (Michie 1984) (listing rezoning and subdividing); Va. Code Ann. § 58.1-3285 (Michie 1984) (rezoning or subdividing). Additionally, one statute mentioned "platted" land; Minn. Stat. § 273.17 (1) (1984); and one referred to subdivision of land. N.C. Gen. Stat. § 105-287 (b) (4) (1979). Although we have held that approval for the subdivision of land "furnishes an appropriate occasion for the revaluation and reassessment of real property"; *Pauker* v. *Roig*, 232 Conn. 335, 344, 654 A.2d 1233 (1995), citing *Fyber Properties Killingworth Ltd. Partnership* v. *Shanoff*, 228 Conn. 476, 483, 636 A.2d 834 (1994); we have never decided whether subdivision approval falls within any of the special circumstances listed in the dictum in *Ralston Purina Co.* that would mandate interim revaluation. *Pauker* v. *Roig*, supra, 343. As to the special circumstances at issue in this case—that is, a substantial change in use and a decision by the taxpayer to go out of business—the question is rendered moot by our holding herein that these nonstatutory special circumstances cannot be used to compel an interim revaluation.

[20] The defendant in *Ralston Purina Co.*, in its brief, cited, by way of example, *People ex rel. Nelson* v. *Jenkins*, 347 Ill. 278, 281, 179 N.E. 854 (1932) (stating that reassessment must stand during interim years unless physical condition of property altered); *Montgomery County Board of Realtors, Inc.* v. *Montgomery County*, 287 Md. 101, 109–10, 411 A.2d 97 (1980) (striking down sales tax on property where tax based on purely economic update of market value); *Davies* v. *National Land & Investment Co.*, 76 Ohio St. 407, 440–41, 81 N.E. 755 (1907) (striking down interim year revaluation conducted solely because property values had increased since last decennial evaluation); *Madway* v. *Board for Assessment & Revision of Taxes*, 427 Pa. 138, 147–48, 233 A.2d 273 (1967) (upholding constitutionality of legislatively disallowing interim year assessments based on market fluctuations while permitting those based on improvements).

## B

Thus far, we have reiterated that the issue, along with the ultimate holding, in *Ralston Purina Co.* was limited to market fluctuations. It is clear that the language listing the purported exceptions to § 12-62 was merely a recitation of a concession made by the defendant and that the language was not a part of this court's analysis in that opinion. Moreover, we have demonstrated the absence of a basis in Connecticut case law, at the time of our decision in *Ralston Purina Co.*, for the existence of the nonstatutory special circumstances listed in the defendant's concession. It is manifest, therefore, that the dictum in our opinion, standing alone, cannot serve as the basis for the recognition of the nonstatutory special circumstances listed therein. The question remains, however, whether, despite the absence of such a basis, we should now recognize those special circumstances contained in the *Ralston Purina Co.* dictum that are at issue in this case.[21] We conclude that we should not.

We return to the statutory scheme governing the revaluation of property. As this court stated in *Uniroyal, Inc.* v. *Board of Tax Review*, supra, 182 Conn. 629, "[t]he remedy of revaluation was established by the legislature and it was the judgment of the legislature that the remedy need only be available once each decade." See General Statutes (Rev. to 1995) § 12-62. We have recognized "the legislature's awareness that, even though property values may fluctuate within a

[21] The trial court found that two of the nonstatutory special circumstances—a substantial change in the use of the property and the taxpayer's decision to go out of business—are present in this case. Accordingly, it is the existence of these two circumstances that the plaintiff claims entitles him to an interim revaluation of the property. Therefore, because a change in zoning classification is not at issue in this case, we do not consider whether such a change could serve as the basis for an interim revaluation. Rather, we leave consideration of that issue for another day.

ten year period, it is neither realistic nor necessarily desirable to require more frequent property revaluations." *Ralston Purina Co.* v. *Board of Tax Review*, supra, 203 Conn. 438, citing *Uniroyal, Inc.* v. *Board of Tax Review*, supra, 182 Conn. 629–30. In noting that the legislature "deliberately fashioned an assessment scheme designed to require assessors to base property valuations upon more reliable, long term market trends"; *Ralston Purina Co.* v. *Board of Tax Review*, supra, 438–39; the court stated: " 'Tax assessors are required to recognize and act on the principle that the true value of a fixed asset such as real estate is fairly constant and must be gauged, not by conditions temporary and extraordinary, but by those prevailing over a period of time, and the assessors, in listing values of property for taxation, may, to a certain extent, disregard excesses of a boom as well as the despair of a depression. *Alfred J. Sweet, Inc.* v. *Auburn* 134 Me. 28, 32, 180 A. 803 [1935].' *Burritt Mutual Savings Bank* v. *New Britain*, 146 Conn. 669, 677–78, 154 A.2d 608 (1959); [*Uniroyal, Inc.* v. *Board of Tax Review*, supra] 628." *Ralston Purina Co.* v. *Board of Tax Review*, supra, 439.

The legislature's recognition of the need for stability in its revaluation scheme is evident in its actions, or nonaction, as the case may be, in response to this court's decisions regarding revaluations of property. "Time and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute."[22] (Internal quotation marks omitted.) *Bocchino* v. *Nationwide Mutual Fire Ins. Co.*, 246 Conn. 378, 386,

---

[22] We note that we have, on occasion, "questioned the use of the legislative acquiescence rule as a tool by which to divine legislative intent"; *Conway* v. *Wilton*, 238 Conn. 653, 678, 680 A.2d 242 (1996); in cases in which, following our decision on a particular issue, the legislature has had insufficient time to respond before we are again called upon to consider the same or a sufficiently related issue. See, e.g., id.

716 A.2d 883 (1998). For example, the court applied this maxim in *Ralston Purina Co.* v. *Board of Tax Review*, supra, 203 Conn. 439, to presume that the legislature's nonaction following *Uniroyal, Inc.* v. *Board of Tax Review*, supra, 182 Conn. 629, in which this court interpreted § 12-62 "as mandating general revaluations of real property only once every decade," was a "validation of that interpretation." Similarly, we note that the legislature took no action in response to this court's decision in *Ralston Purina Co.*

In contrast, however, almost immediately after, and in direct response to, this court's decision in *84th Century Ltd. Partnership* v. *Board of Tax Review*, 207 Conn. 250, 263, 541 A.2d 478 (1988), holding that assessors "did have the power under § 12-55 to adjust a real estate assessment in the interim years between decennial revaluations on the ground that a sale of the property in question showed that the property had greatly increased in value in relation to other properties in the town," the legislature enacted No. 88-321, §§ 9 and 10, of the 1988 Public Acts, which became General Statutes § 12-63d. Section 12-63d provides that "[t]he assessor in any municipality may not, with respect to any parcel of real property in the assessment list for any assessment year, make a change in the assessed value of such parcel, as compared to the immediately preceding assessment list, solely on the basis of the sale price of such parcel in any sale or transfer of such parcel." In other words, the legislature has continued to recognize and create the conditions under which taxpayers may compel assessors to conduct interim revaluations of their properties.

In light of the clarity of the statutory scheme, providing as it did for revaluations every ten years, now every twelve years; see footnote 2 of this opinion; with revaluations in the intervening years mandated only in extremely limited circumstances, and the amount of

control the legislature has demonstrated over the structure of the revaluation framework, we conclude that the recognition of the nonstatutory special circumstances at issue in this case—that is, a substantial change in use of the property or a decision by the taxpayer to go out of business—would not comport with the revaluation scheme established by the legislature.

We note further that recognition of the nonstatutory special circumstances in the present case, although technically not violative of the holding in *Ralston Purina Co.* v. *Board of Tax Review,* supra, 203 Conn. 439, that assessors are not required to conduct interim revaluations based solely upon changes in market conditions, would undermine the spirit of that holding. This is so because, as the plaintiff himself testified, his decision to sell his business, which thereby changed the use of the property, was in response to changes in market conditions. Consequently, the two special circumstances that the plaintiff claims serve as the basis for the interim revaluation he seeks are a direct result of changes in market conditions, which this court, in *Ralston Purina Co.*, expressly held to be an insufficient basis upon which to compel an interim revaluation.[23]

---

[23] Following the same reasoning, although recognition in this case of the nonstatutory special circumstances technically would not run afoul of § 12-63d, it would undermine the spirit of that statute. As noted previously, § 12-63d prohibits assessors from adjusting assessments based upon the sale price of any property in the sale or transfer of that property. As this court has recognized, a foreclosure by sale automatically establishes the fair market value of a property. See *New England Savings Bank* v. *Lopez,* 227 Conn. 270, 278–79, 630 A.2d 1010 (1993). Elsewhere this court has acknowledged that a property's fair market value can be equated with its sale price. See, e.g., *Uniroyal, Inc.* v. *Board of Tax Review,* 174 Conn. 380, 390, 389 A.2d 734 (1978) (" 'fair market value' is generally said to be 'the value that would be fixed in fair negotiations between a desirous buyer and a willing seller, neither under any undue compulsion to make a deal' "). Therefore, logic dictates that § 12-63d, which prohibits assessors from adjusting an assessment based solely upon sale price, would likewise prohibit such an adjustment based upon the value fixed at a foreclosure by sale, which, as noted, is how the plaintiff reacquired title to the subject property in the present case.

To recognize the nonstatutory special circumstances in this case would, in effect, allow a change in market conditions to masquerade as a change in use and a decision to go out of business in order to circumvent this court's holding in *Ralston Purina Co.* This we will not do.

## C

Finally, we take note of the policy considerations militating against the recognition of the nonstatutory special circumstances at issue in this appeal. Requiring all real property in a given municipality to be assessed, for taxation purposes, during the same time period helps to ensure fair and equal taxation of property owners. The property revaluation scheme created by the legislature establishes such a requirement and furthers that goal. Recognition of the nonstatutory special circumstances espoused by the plaintiff would provide an incentive for owners of struggling businesses to go out of business in order to reduce their taxes rather than to make every reasonable effort to improve their businesses and to continue competing. As a result, property that would otherwise be put to use might lie unused.

Additionally, we note that the plaintiff's decision to sell his business was a decision made by an experienced businessman. In response to changes in the skilled nursing care market, the plaintiff sold the facility, together with the license to operate a skilled nursing facility. With the proceeds, the plaintiff was able to pay off a mortgage of approximately one million dollars and still have approximately $650,000 left to use as he chose. When title to the property returned to him after foreclosure, without the accompanying license, the property's value had substantially decreased as a direct result of the plaintiff's voluntary decision to sell his business.

There is nothing in the record to indicate that the sale was other than an arm's length transaction. We do not believe that it makes sound policy, following the plaintiff's business decision, from which he profited, to sell his business—which resulted in a significant decrease in the property's value—to reward the plaintiff by reducing his taxes. Such a result would allow the plaintiff to profit from both the sale of the business *and* from his lowered tax burden.

As noted previously, the only circumstance provided by statute mandating an interim revaluation that would *reduce* a taxpayer's tax burden is damage to a building on the property requiring demolition or total reconstruction. See General Statutes § 12-64a. Such circumstances are not the result of a voluntary decision by the taxpayer but are attributable to circumstances presumably beyond his or her control. We conclude, therefore, that to allow for a reduction in the plaintiff's tax burden in response to a voluntary business decision by the plaintiff that resulted in a significant decrease in the value of the property would not comport with the statutory revaluation scheme established by the legislature.

Accordingly, based on the foregoing, we decline to recognize the nonstatutory special circumstances mentioned in the dictum in *Ralston Purina Co.*—that is, a substantial change in the use of the property or a decision by the taxpayer to go out of business—that the plaintiff asserts entitles him to an interim revaluation of his property.

### III

We turn now to the second issue on appeal, that is, whether § 12-55, which authorizes an assessor to equalize tax lists by making interim adjustments in assessments, likewise affords the taxpayer a vehicle by

which to compel such interim adjustments. We conclude that it does not.

General Statutes (Rev. to 1995) § 12-55 (a) provides in part: "When the lists of any town have been so received or made by the assessor or board of assessors, they shall equalize the same, if necessary, and make any assessment omitted by mistake or required by law. The assessor or board of assessors *may* increase or decrease the valuation of property as named in any of such lists or in the last-preceding grand list . . . ." (Emphasis added.)

The defendant claims that although § 12-55 *authorizes* interim changes in assessment value by an assessor, it cannot be used by a taxpayer to *compel* such interim changes. By contrast, according to the plaintiff: (1) this court has consistently stated that, in unusual circumstances, assessors can be required to make interim revaluations of real property; and (2) the trial court properly concluded that this court's decision in *84th Century Ltd. Partnership* v. *Board of Tax Review*, supra, 207 Conn. 250, which the plaintiff argues left the door open for the conclusion that § 12-55 could be used to *compel* an interim revaluation, served as a legitimate basis for allowing interim revaluations under § 12-55.

Section 12-55, which was originally enacted in 1851,[24] is of sufficiently ancient origin to preclude the existence of any relevant legislative history. To resolve this issue, therefore, we are left with the following tools: the plain language of the statute, the statute's relation to the statutory scheme, and this court's discussions of the statute.

First, we note that the plain language of the statute confers upon assessors the broad power to equalize tax lists, "if necessary." It does not, explicitly or implicitly,

[24] Public Acts 1851, c. 47, § 36.

grant to taxpayers the power to compel assessors to conduct interim revaluations. It would have been relatively simple for the legislature to include language in the statute requiring assessors, upon request of a taxpayer under the appropriate circumstances, to conduct an interim revaluation. This the legislature did not do.

Second, we consider the revaluation scheme established by the legislature, which, as discussed previously, provides for decennial revaluations with interim revaluations required only in very limited circumstances that are not at issue in this case. Because the legislature circumscribed the exceptions so narrowly, we conclude that to interpret § 12-55 so as to permit taxpayers to compel interim revaluations would contravene the statutory scheme.[25]

Finally, a brief review of this court's discussions of § 12-55 demonstrates the statute's permissive, as opposed to mandatory, nature. For example, in *Ralston Purina Co.* v. *Board of Tax Review*, supra, 203 Conn. 437, this court noted that "§ 12-55 appears to be permissive, rather than mandatory . . . ." The following year, in *84th Century Ltd. Partnership* v. *Board of Tax Review*, supra, 207 Conn. 251, the court considered "whether a municipal assessor has the power, under . . . § 12-55, to increase a real property assessment between decennial revaluations on the ground that a sale of the property in question demonstrates that the property has greatly increased in value in relation to other properties in the municipality." We concluded that "although an assessor, absent unusual circumstances that do not exist in this case, cannot be *required*

---

[25] Additionally, although we have no legislative history upon which to rely for legislative intent, it is reasonable to conclude that reflected in this statutory scheme is a desire to conserve municipal resources. Accordingly, if we were to allow taxpayers to compel interim revaluations, which require expenditure of such resources, we would be subverting what we believe to be one of the main reasons the legislature established a system mandating revaluations decennially, rather than more frequently.

to make . . . an interim revaluation of real property, he *may* do so in accordance with § 12-55, under appropriate circumstances." (Emphasis added.) Id. The plaintiff argues that the special circumstances at issue in this case are of the kind of unusual circumstances that can serve as the basis of an interim revaluation pursuant to § 12-55. This assertion, however, ignores, the clearly permissive nature of the court's words regarding § 12-55.[26]

The year after this court decided *84th Century Ltd. Partnership*, the court decided *Stop & Shop Cos.* v. *East Haven*, 210 Conn. 233, 243, 554 A.2d 1055 (1989), in which it declared that we could not improve upon the Appellate Court's language or reasoning when it stated that § 12-55 "provid[ed] for a *permissive* valuation of property in the years between the decennial revaluations, *without requiring it.* . . . Rather, § 12-55 allows towns to engage in *voluntary* tax relief when property has decreased in value." (Emphasis added; internal quotation marks omitted.) Finally, as recently as 1995, in *Pauker* v. *Roig*, 232 Conn. 335, 343, 654 A.2d 1233 (1995), we summarized our conclusion in *84th Century Ltd. Partnership* v. *Board of Tax Review*, supra, 207 Conn. 251, by stating that "although tax assessors cannot be *required* to make an interim revaluation of property, they *may* do so in accordance with § 12-55 . . . ." (Emphasis added.)

---

[26] For support, the plaintiff cites language in *84th Century Ltd. Partnership* v. *Board of Tax Review*, supra, 207 Conn. 262, in which this court stated: "There is no ambiguity in [the] broad grant of powers to assessors. It is a clear legislative mandate to grant to local assessors a continuing duty unrelated to decennial revaluations, to achieve administratively a fair and equal assessment for all taxpayers." In response, we reiterate that the sole issue in that case was whether under § 12-55 an assessor "ha[d] the power . . . to increase a real property assessment between decennial revaluations" based on an increase in the property's value as evidenced by the sale price of the property. Id., 251. This court's discussion of the nature of § 12-55 was therefore limited to the statute's permissive nature. As we stated in that case, the right of a taxpayer to compel interim relief did not come into play. Id., 262.

To summarize, in *84th Century Ltd. Partnership* v. *Board of Tax Review*, supra, 207 Conn. 251, this court held that § 12-55 *permits* assessors to conduct interim revaluations. All of this court's discussions of the statute, both prior and subsequent to the decision in that case, support the proposition that § 12-55 is permissive rather than mandatory in nature. This proposition is supported by the plain language of the statute as well as the revaluation scheme as set forth in the statutes. Neither the arguments advanced by the defendant nor the opinion of the trial court contains persuasive reasoning compelling us to conclude otherwise. We conclude, therefore, that although § 12-55 permits assessors to conduct interim revaluations of property, it cannot be used to compel such revaluations.

## IV

In summary, we conclude that, under § 12-62, neither a change in a property's use nor a decision by a taxpayer to go out of business creates a sufficient basis for a mandatory interim revaluation of property. Additionally, we conclude that § 12-55 cannot be used by a taxpayer to compel an interim revaluation of property.

The judgment is reversed and the case is remanded with direction to render judgment for the defendant.

In this opinion, CALLAHAN, C. J., and BORDEN, PALMER and PETERS, Js., concurred.

MCDONALD, J., with whom BERDON, J., joins, dissenting. I would affirm the judgment of the trial court.

The majority would remove any suggestion found in *Ralston Purina Co.* v. *Board of Tax Review*, 203 Conn. 425, 525 A.2d 91 (1987), that drastic circumstances affecting the value of particular real estate might offer a taxpayer some relief before the next revaluation, sometime in the, perhaps distant, future. See footnote 1 of this dissent.

The road to this unfortunate result began with *Uniroyal, Inc.* v. *Board of Tax Review*, 182 Conn. 619, 629, 438 A.2d 782 (1981), in which this court held that the exclusive remedy for variations in real estate values due to changing real estate market conditions is the decennial revaluation mandated by law. In *Uniroyal, Inc.*, the plaintiffs sought a revaluation of their property, claiming that the town was taxing their properties at a disproportionately high ratio of assessed value to sales price. Id., 623–24. This court observed that "the remedy for variations in the effect of market conditions on different parcels is set forth in General Statutes § 12-62. The remedy of revaluation was established by the legislature and it was the judgment of the legislature that the remedy need only be available once each decade." Id., 629. In reaching this decision, the court noted: "The plaintiffs' property most likely benefited from continued use of the 1971 valuation figures for assessment purposes throughout the 1970s and the failure of the 1971 figures to reflect property value increases in subsequent years as much as any other property owner. Such variation accruing within ten-year periods is a permissible variation under the legislative scheme for assessment." Id. In *Uniroyal, Inc.*, this court refused to order an interim revaluation of the property based on general real estate market fluctuations, reasoning that every taxpayer was affected equally by the general fluctuation in real estate values.

In *Ralston Purina Co.* v. *Board of Tax Review*, supra, 203 Conn. 439, this court transformed the general real estate market conditions at issue in *Uniroyal, Inc.* into "market conditions" affecting a particular business conducted on a taxpayer's commercial property. The court refused to grant interim relief to a taxpayer whose real estate was severely and particularly devalued, not due to general fluctuations in the real estate market, but,

rather, solely from "changes in market conditions in the mushroom industry." Id., 433. As Justice Shea noted in his dissent, "[t]his reduction of more than two-thirds [in the value of the plaintiffs' property] resulted from circumstances uniquely concerning the plaintiffs' property and not affecting other property in the town." Id., 442 (*Shea, J.*, dissenting). Under these circumstances, Justice Shea concluded that the defendant board of tax review had a duty to "equalize and adjust the valuations and assessment lists . . . ." Id., citing General Statutes § 12-111.

In this case, the plaintiff is bearing a disproportionate tax burden due to changes in the nursing home business, not general real estate market trends. As a result of these changes, he sold his business but his repeated attempts thereafter to sell the property were unsuccessful because the property was no longer suited for a nursing home. For tax years 1995 and 1996, the plaintiff's property was assessed at $406,000, even though the trial court determined that the fair market value of the property was then $80,000.

In holding that the plaintiff is not entitled to an interim revaluation of his property, the majority focuses upon the plaintiff's testimony that his decision to go out of business "was in response to changes in market conditions." These market conditions were not, of course, general real estate market conditions, but market conditions in the nursing home business. Following *Ralston Purina Co.*, the majority concludes that these market fluctuations are insufficient to compel a so-called "interim revaluation"[1] of the plaintiff's property. The

---

[1] The term "interim" envisions an end to the period of assessment, which is far from certain at this time. The fact is that the city of Waterbury has not complied with the mandate that it revalue property every decade. See General Statutes (Rev. to 1995) § 12-62. The city of Waterbury has not revalued real property since 1980, and the tax years at issue in this case are 1995 and 1996. The majority's decision compounds the evils of what has become, in many tax districts, a permanent assessment valuation.

net effect of the majority's decision leaves the plaintiff bearing a wholly disproportionate share of the tax burden, since only his property has been subject to the effects of the changes in the nursing home industry. Such an unfair burden warrants judicial intervention. See *Chamber of Commerce of Greater Waterbury, Inc.* v. *Waterbury*, 184 Conn. 333, 336, 439 A.2d 1047 (1981) ("[a]ny circumstances indicating that a disproportionate share of the tax burden is being thrust upon a taxpayer would warrant judicial intervention").

In part II C of its opinion, the majority states that permitting interim revaluations in cases such as this one would "provide an incentive for owners of struggling businesses to go out of business in order to reduce their taxes rather than to make every reasonable effort to improve their businesses and to continue competing. As a result, property that would otherwise be put to use might lie unused." The majority here advances a tax policy with the goal of forcing owners of struggling businesses to carry on rather than selling their businesses. This is contrary to the United States constitution,[2] which grants each person freedom to invest capital and labor where and when that person chooses.

For the foregoing reasons, I would affirm the judgment of the trial court.

Accordingly, I dissent.

---

[2] Section 1 of the thirteenth amendment to the United States constitution provides: "Neither slavery nor involuntary servitude, except as a punishment

for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."