## LUELLA W. DAVIS ET AL. *v.* TOWN OF WESTPORT ET AL.
### (AC 19685)

Lavery, C. J., and Schaller and Dupont, Js.

Argued November 2, 2000—officially released February 20, 2001

*Walter A. Flynn, Jr.*, with whom, on the brief, was *Jo-Ann R. Sensale*, for the appellant (named defendant).

*Robert H. Rubin*, for the appellee (named plaintiff).

*Opinion*

DUPONT, J. The defendant town of Westport[1] appeals from the judgment of the trial court reducing the assessment of certain of the real property of the plaintiff Luella W. Davis.[2] The defendant claims that (1) the court should have held a hearing on its objection to the report of an attorney trial referee, (2) the plaintiff could not prevail on her claim of an unjust tax and unfair share of the municipal tax burden in the absence of fair market value evidence, (3) the plaintiff could not appeal except in a revaluation year and (4) the court improperly awarded expert testimony costs. We set aside the

---

[1] The other defendant in this action is the board of tax review of the town of Westport. Only the town of Westport has appealed from the judgment of the trial court. We therefore refer in this opinion to the town of Westport as the defendant.

[2] Martin S. Davis, the husband of the plaintiff, Luella W. Davis, was originally a party to this action. He quitclaimed to her, however, all of his interest in the jointly held real property at issue. Luella W. Davis is the sole owner of the property and, consequently, the sole plaintiff for purposes of the present action. We therefore refer in this opinion to her as the plaintiff.

award of appraisal fees and affirm the judgment of the trial court in all other respects.

The parties do not dispute the relevant facts or procedural history. In 1993, the plaintiff and her husband, Martin S. Davis, purchased the property known as 60 Beachside Avenue in Westport. The property contained approximately 2.92 acres and had an assessed land value of $917,840. In 1995, the plaintiff and Martin S. Davis acquired the immediately adjacent property known as 62 Beachside Avenue, containing about three acres. The town assessor determined that the assessed land value of that parcel was $1,309,000. The value assessments represented the fair market values for the land that the assessor had determined for the grand list of October 1, 1985, which was when the last revaluation of all real property in Westport occurred.

The Davises then filed an application with the Westport planning and zoning commission (commission) to build a new single family residence comprised of nearly 13,000 square feet that would straddle the boundary line of the two lots. On June 15, 1995, the commission issued a resolution concerning the Davises' application. The commission conditioned its coastal area management approval of the application on a merger of the two lots. The Davises abided by the condition and merged the two properties into one 5.39 acre lot. They demolished the existing structures on the two lots and constructed one new home. This appeal does not involve the fair market value of the new home, but involves, rather, the 1985 assessment of the consolidated lot. The lot is a premier piece of shorefront property with 1000 feet of frontage on Long Island Sound.[3]

---

[3] Evidence at trial established that the Davises purchased the land and existing buildings for a total of $8.6 million. That figure, far in excess of the assessed value advanced by either the plaintiff or the defendant, is not relevant for purposes of resolving this appeal. As previously noted, the only figures relevant to this tax appeal are those relating to 1985 assessments. The purchase price of the property has no bearing on a challenge to a 1985

The assessor combined the properties into one on the grand list of October 1, 1995, and modified the assessment map to depict the plaintiff's property as one lot. For the 1995 tax year, the assessor determined that the new assessed value of the larger, merged lot was $2,226,840. That figure represents the simple addition of the two 1985 assessed values of the separately purchased lots ($917,840 plus $1,309,000). The plaintiff objected to the assessed value and requested that the town board of tax review (board) reduce the assessment. The board denied the request and approved the assessed value. The plaintiff then appealed to the Superior Court pursuant to General Statutes § 12-117a.[4] She claimed that the assessment was grossly excessive, disproportionate and unlawful. At trial, the plaintiff did not claim that the assessor assessed the one lot, which had been two lots, in excess of fair market value. She contended, instead, that the assessor did not use the same methodology that he employed for other single lots on the same street. As permitted by statute, the plaintiff amended her appeal to include the assessments for the 1996, 1997 and 1998 tax years.[5]

The court referred the appeal to an attorney trial referee to review the board's decision and to hold a

valuation. Additionally, both the land and the plaintiff's new home were to be reassessed in the next revaluation year.

[4] General Statutes § 12-117a provides in relevant part: "Any person . . . claiming to be aggrieved by the action of the board of tax review . . . may, within two months from the date of the mailing of notice of such action, make application, in the nature of an appeal therefrom, with respect to the assessment list for the assessment year commencing October 1, 1989, October 1, 1990, October 1, 1991, October 1, 1992, October 1, 1993, October 1, 1994, or October 1, 1995, and with respect to the assessment list for assessment years thereafter, to the superior court for the judicial district in which such town or city is situated . . . ."

[5] General Statutes § 12-117a provides in relevant part: "If, during the pendency of such appeal, a new assessment year begins, the applicant may amend his application as to any matter therein, including an appeal for such new year, which is affected by the inception of such new year . . . ."

hearing on the law and facts. The referee heard the appeal in November, 1998, and issued a report on April 14, 1999. The referee found that the assessor had failed to employ the methodology used and applied to other like properties, and did not, therefore, apply uniform percentages as required by General Statutes § 12-64.[6] The referee then determined that the appropriate method for valuing waterfront property in Westport resulted in a fair assessed value of $1,493,030 for the plaintiff's land. Accordingly, the report recommended a refund of taxes paid and attributable to the excess assessment on the property, together with interest at the statutory rate for the four tax years involved, and compensation of $2500 to the plaintiff for the testimony and reports of her expert witnesses. On May 21, 1999, the court, over the defendant's objection to the report, rendered judgment in accordance with the referee's report. This appeal followed. We will provide additional facts as they become relevant to the defendant's claims.

I

We must first determine whether the rules of practice granted the defendant a hearing as of right on an objection to the referee's report before the court could render judgment, for if the defendant was so entitled we must remand the case and forgo a discussion of the remaining issues. The defendant claims that Practice Book (1999) § 19-16 required the court to give it the opportunity to claim the case to the short calendar for a hearing on the objection to acceptance of the referee's report. We disagree.

---

[6] General Statutes § 12-64 (a) provides in relevant part: "All the following-mentioned property, not exempted, shall be set in the list of the town where it is situated and, except as otherwise provided by law, shall be liable to taxation at a uniform percentage of its present true and actual valuation, not exceeding one hundred per cent of such valuation, to be determined by the assessors . . . ."

The defendant filed an objection to the adoption of the referee's report on April 27, 1999, and amended that objection on April 28, 1999. The plaintiff filed comments on the amended objection on May 5, 1999. Neither party ever requested oral argument nor indicated any desire for oral argument on the papers filed with the court. The court overruled the defendant's objection and rendered judgment on May 21, 1999, in accordance with the referee's report.

Practice Book (1999) § 19-16 provides in relevant part that "[i]f exceptions or objections have been seasonably filed, the case should be claimed for the short calendar for hearing thereon . . . ." This court recently determined that a correct interpretation of Practice Book (1999) § 19-16 does not include a hearing as a matter of right. *Paulus* v. *LaSala*, 56 Conn. App. 139, 145–46, 742 A.2d 379 (1999), cert. denied, 252 Conn. 928, 746 A.2d 789 (2000).[7] In arriving at that conclusion, we did not read Practice Book (1999) § 19-16 in isolation, but in conjunction with Practice Book (1999) § 11-18, which provides in relevant part: "Oral argument is at the discretion of the judicial authority except as to motions to dismiss, motions to strike, motions for summary judgment, and motions for judgment of foreclosure. For those motions, oral argument shall be a matter of right, provided (1) the motion has been marked ready for adjudication . . . and (2) the movant indicates at the bottom of the first page of the motion or on a reclaim slip that oral argument or testimony is desired . . . ."[8] Therefore, we concluded that "even if [Practice Book

---

[7] Practice Book (1999) § 19-16 was amended effective January 1, 2000. Practice Book (1999) § 19-16 was in effect at the time the defendant objected to the acceptance of the report and at the time we decided *Paulus*. *Paulus*, therefore, is applicable to the present case.

[8] Practice Book (1999) § 11-18 also was amended effective January 1, 2000. It now provides in relevant part: "Oral argument is at the discretion of the judicial authority except as to . . . motions for judgment on the report of an attorney trial referee and/or hearing on any objections thereto. . . ."

(1999) § 19-16] grants . . . oral argument as of right, it is not automatic but must be claimed for argument as provided in [Practice Book (1999) § 11-18]. . . . Aside from the plain meaning of the words of those sections, which do not grant oral argument as of right . . . judicial economy and practicality require a common sense reading of both sections." *Paulus* v. *LaSala*, supra, 146.

We find that *Paulus* is dispositive of the defendant's claim.[9] The defendant did not enjoy an automatic right to a hearing and it failed to indicate any desire for one. We conclude, therefore, that the court acted properly and turn to the remaining issues on appeal.

## II

Before considering the merits of the parties' arguments, we articulate the basic legal principles and standard of review applicable to the remaining issues on appeal. A trial court hears tax appeals pursuant to § 12-117a de novo and "must arrive at [its] own conclusions as to the value of [the taxpayer's property] by weighing the opinion of the appraisers, the claims of the parties in light of all the circumstances in evidence bearing on value, and [its] own general knowledge of the elements going to establish value . . . ." (Internal quotation marks omitted.) *Xerox Corp.* v. *Board of Tax Review*, 240 Conn. 192, 204, 690 A.2d 389 (1997). We are bound by the trial court's findings of facts unless those findings are clearly erroneous, but we invoke a plenary review of any legal conclusions. We must, therefore, decide whether the conclusions are legally and logically correct, and find support in the record. Mindful of those basic principles, we now consider each of the claims on appeal.

---

[9] At the time the defendant filed its appeal, we had not yet decided *Paulus*. The issue of whether the defendant was entitled to a hearing as of right was, therefore, unsettled.

The defendant claims that the plaintiff could not prevail on her claim of disproportionate, grossly excessive, unlawful or unequal tax treatment without introducing evidence of fair market value at trial. The defendant argues that the plaintiff's failure to establish fair market value prevented the court from determining whether the assessor complied with the mandates of § 12-64. In support of that claim, the defendant asserts that the cases addressing discriminatory tax treatment arise out of differing, and therefore nonuniform, assessment percentages applied to fair market value, not out of varying assessment methodologies. The plaintiff did not offer evidence of either assessment percentages applied or fair market value. The defendant argues that the plaintiff cannot, therefore, seek judicial review of the assessment because there is no "authority to substantiate [her] position that there is some inalienable right to judicial review of an assessment where it can somehow be proven that the town has acted in an unfair or discriminatory way toward one of its taxpayers. . . . This argument is not supported . . . by any precedent propounded by the plaintiff."

The plaintiff maintains that she need not introduce evidence of fair market value when her claim focuses instead on the discriminatory approach in the assessment method. The plaintiff argues that the absence of a fair market value appraisal did not preclude the referee from concluding that the assessment method was discriminatory and resulted in a disproportionate tax. The plaintiff claims that the assessor should have based the assessment of her property on 1985 fair market values using the same methodology, formula and factors he used in 1985 for similarly situated one lot parcels of land. The plaintiff does not claim any impropriety in the 1985 fair market value.[10] We agree with the plaintiff.

---

[10] The plaintiff submitted two reports into evidence, neither of which concerned the fair market value of the plaintiff's lot. The reports showed other sales of comparable properties, but only to illustrate the methodology the assessor employed.

A

We first discuss the plaintiff's appeal under § 12-117a. As previously noted, an aggrieved taxpayer may appeal to the Superior Court. In a § 12-117a appeal, the court potentially performs two functions. Initially, the court determines whether the board's action aggrieved the taxpayer. *Sibley* v. *Middlefield*, 143 Conn. 100, 105, 120 A.2d 77 (1956). A taxpayer satisfactorily demonstrates aggrievement where the board's action will require the payment of an unjust and, therefore, illegal tax. Id. An affirmative finding of aggrievement is an absolute condition precedent to the second function, which involves the court's broad discretionary power to grant appropriate relief.[11] Id. In exercising its discretion, the court should correct the valuation. *Konover* v. *West Hartford*, 242 Conn. 727, 736, 699 A.2d 158 (1997).

The issue of aggrievement involves a two part analysis, which entails both factual determinations and a question of law. Whether a specific action that the assessor takes in his valuation has aggrieved a taxpayer is a question of law. See *Nader* v. *Altermatt*, 166 Conn. 43, 55, 347 A.2d 89 (1974); *Sibley* v. *Middlefield*, supra, 143 Conn. 105; *Ives* v. *Goshen*, 65 Conn. 456, 459, 32 A. 932 (1895). "Whether a property has been overvalued for tax assessment purposes is a question of fact for the trier." *Newbury Commons Ltd. Partnership* v. *Stamford*, 226 Conn. 92, 103, 626 A.2d 1292 (1993). In other words, in the context of this appeal, we review de novo whether the assessor's method, which continued to treat the plaintiff's property as two separate parcels after she and her husband merged the lots at the request of the commission, constitutes aggrievement for purposes of § 12-117a.

---

[11] General Statutes § 12-117a confers upon the court "the power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable . . . ."

In the present case, the referee found that the plaintiff had established aggrievement by showing that the assessor deviated from the method he had used in all other assessments for properties located on Beachside Avenue and for other waterfront properties.[12] Our question becomes whether, as a matter of law, on the basis of facts found by the referee, the plaintiff established that the assessment, which treated her properties as individual lots rather than one merged lot, resulted in an improper tax and, therefore, aggrieved her. We conclude that she was so aggrieved.

Each party presented the testimony of one witness at the hearing before the referee. David P. Fugitt, a licensed, tenured general appraiser, testified for the plaintiff, and Kenneth C. Carvell, the defendant's assessor at the time of the disputed assessments, testified for the defendant. The base assessment date involved in both experts' testimony was October 1, 1985, the date of the last townwide revaluation as of the date of the trial.

We note initially that the referee is particularly cloaked with the power to make credibility determinations. "[T]he acceptance or rejection of an opinion of a qualified expert is a matter for the trier of fact unless

---

[12] We note that the referee's finding that the assessor's method violated the mandates of General Statutes § 12-64 did not specifically address aggrievement under General Statutes § 12-117a. The referee stated in her report that "[b]ecause the assessor failed to employ the methodology used and applied to other like properties, the assessor as a matter of fact failed to apply uniform percentages to the present true and actual valuation of properties of the grand list in violation of § 12-64 . . . ." The referee's factual findings support, however, a finding of aggrievement as a matter of law under § 12-117a. We can sustain a conclusion on facts different from those relied on by the trial court. See State v. Mierez, 24 Conn. App. 543, 547, 590 A.2d 469, cert. denied, 219 Conn. 910, 911, 593 A.2d 136 (1991). Accordingly, "[w]e need not be concerned with the validity of the court's theory in support of [the] judgment; since the judgment is correct it must stand." Groton v. Commission on Human Rights & Opportunities, 169 Conn. 89, 101, 362 A.2d 1359 (1975).

the opinion is so unreasonable as to be unacceptable to a rational mind." *National Folding Box Co.* v. *New Haven*, 146 Conn. 578, 586, 153 A.2d 420 (1959). Although the courts should accord an assessor's testimony substantial deference, no judicial presumption exists as to the validity of that assessor's conclusions. *Stamford Apartments Co.* v. *Stamford*, 203 Conn. 586, 589, 525 A.2d 1327 (1987).

Fugitt submitted two reports, one that analyzed the defendant's method of assessing land on Beachside Avenue and one that analyzed the defendant's method for assessing other waterfront property located in the town. Those reports and Fugitt's testimony explained the assessor's methodology. According to Fugitt, the methodology effectively involves a three step procedure: A primary site valuation, a residual acreage valuation and consideration of certain influence factors.

In 1985, for waterfront property in the town, the assessor assigned a value of $1.1 million to a property's "primary site." A primary site consists of a two acre building site[13] with water frontage. The assessor then classified other acreage on the property, typically the acreage in excess of the two acres identified as the primary site,[14] as "residual acreage." Residual acreage was that land that the owner could not use as a building site and that had no potential for development. The assessor valued residual acreage at 10 percent of the value of the primary site, or $110,000 per acre. Finally, the methodology subjected certain property characteristics to an influence factor. Characteristics such as landscaping, flooding, restrictions, location, shape and

---

[13] In the context of the varying formulae, this opinion continually refers to land areas in terms of two acres because the minimum area for a building lot on Beachside Avenue is two acres.

[14] Fugitt's report of the town's method of assessing land on Beachside Avenue indicated that the assessor had assigned certain lots more than one $1.1 million value. Those lots were 66, 76, 86 and 106 Beachside Avenue.

size could, on the basis of those influence factors, increase or reduce the value of the property.

Fugitt's reports indicated that the assessor, with some exception,[15] employed that method for the relevant tax years. Fugitt attributes any exception to or deviation from that formula to the possibility of subdivision, irrespective of the owner's intent to subdivide.[16] Accordingly, because the plaintiff cannot now subdivide the subject property due to the large residence that straddles the boundary line and because she agreed to the commission's requirement to merge the two lots, facts that neither side disputes, Fugitt determined that the assessment should not include any additional primary site value.[17]

---

[15] See footnote 14.

[16] Fugitt examined the assessments for properties that included more than one $1.1 million value to explain his subdivision theory. As discussed in footnote 14, those properties were located at 66, 76, 86 and 106 Beachside Avenue. Fugitt explained the assessments in terms of the owner's ability to subdivide the lot. For example, 66 Beachside Avenue contains 7.13 acres. According to Fugitt, given the placement of the dwelling, the owner could subdivide that lot into two two acre waterfront parcels and one two acre nonwaterfront lot. Accordingly, he proffered, for 66 Beachside Avenue the assessor valued the two acre parcels on Long Island Sound at $1.1 million each and the other two acre lot away from Long Island Sound at $300,000. The assessor considered any remaining acreage, Fugitt explained, as residual acreage. Fugitt testified similarly in explaining the assessment value for 76, 86 and 106 Beachside Avenue, except that none of those parcels contained a second two acre waterfront area.

[17] The defendant claims that the referee's conclusion that the plaintiff's property was subject to disproportionate taxation cannot stand, as it was based on the referee's erroneous finding that the assessor used the same methodology for all waterfront properties on Beachside Avenue. The referee found Fugitt's testimony credible as to the assessor's methodology for Beachside Avenue property and as to the deviation from that formula only where there was a possibility of subdivision. Because the plaintiff can no longer subdivide her property, the referee concluded that the assessor should have used the same basic formula to assess the plaintiff's property that he had used to assess other properties on Beachside Avenue that could not be subdivided. In light of our determination that the referee's decision to credit Fugitt's testimony regarding the methodology was not unreasonable, we conclude that the referee's finding that the assessor used the same

Carvell, on the other hand, offered a different explanation of the assessment methodology. Carvell insisted that when valuing property in Westport, the possibility of subdivision was not a factor. The relevant factor was the pricing of waterfront acreage. Carvell testified that he assigned the other properties on Beachside Avenue that contained two acres of waterfront and *fewer than four acres overall* only one primary site value of $1.1 million and that he valued the remaining acres as residual. Carvell testified further that he assessed properties containing *more than four acres* differently. Those properties received a $1.1 million value for any two acres of waterfront, a $300,000 value for any two acres of nonwaterfront and a $110,000 value for each additional acre as residual acreage.[18]

Pursuant to that formula, Carvell testified that he treated 1.39 acres of the plaintiff's 5.39 acre lot as residual acreage and the other four acres as two primary waterfront sites. The plaintiff's property had two two acre waterfront areas, and he assigned each of those two acre areas a $1.1 million value. The remaining acreage, residual acreage, was valued at $110,000 per acre.[19]

methodology to assess all properties on Beachside Avenue, except for those properties that could be subdivided, was not improper.

[18] Carvell examined the assessments of those properties that exceeded four acres to explain his waterfront acreage theory. For example, 66 Beachside Avenue contains 7.13 total acres. It has four waterfront acres, two nonwaterfront acres and 1.13 residual acres. He assigned the four waterfront acres two $1.1 million values (one for each two acre area), the two nonwaterfront acres a $300,000 value and the 1.13 acres a value of $110,000 per acre. He explained the other properties in excess of four acres, namely, 76, 86, 106 and 60 Beachside Avenue (the plaintiff's property), similarly.

[19] An examination of Carvell's testimony as a whole casts doubt on whether Carvell actually used the formula in reassessing the plaintiff's merged lot. At one point, Carvell stated that "the assessment for land on number 60 and the assessment for land on number 62, were added together." He remarked later that "[g]iven the excess excessive frontage, [a separate special valuation of the plaintiff's property] might have been contemplated, but the revaluation was coming—supposedly coming for '95—so no new schedule was concocted to handle this particular property." As the referee stated in her report, it would appear that Carvell "backed into" that methodology when the plaintiff questioned the assessment.

The referee found that the assessor utilized the methodology explained by Fugitt for property on Beachside Avenue, namely the methodology that considered the possibility of subdivision rather than waterfront acres. Furthermore, the referee's reduction of the assessment impliedly recognizes that she credited Fugitt's testimony as to the town's method and credited his analysis of the appropriate valuation of the subject property rather than Carvell's assessment scheme. As we previously discussed, that credibility determination must stand unless it is unreasonable. *Hutensky* v. *Avon*, 163 Conn. 433, 438, 311 A.2d 92 (1972).

"The claim that the property had been *wrongfully* or *excessively* assessed could have been appealed in one of two ways: (1) to the board of tax review [under section 12-111] and from there, within two months, to the Superior Court pursuant to [§] 12-111 . . . or (2) by direct action to the court . . . pursuant to [General Statutes] § 12-119." (Emphasis added; internal quotation marks omitted.) *Farmington* v. *Dowling*, 26 Conn. App. 545, 550, 602 A.2d 1047 (1992), appeal dismissed, 224 Conn. 592, 619 A.2d 852 (1993).

A distinction exists between an excessive assessment and a wrongful assessment. The plaintiff did not maintain at trial that the assessment was excessive. Indeed, she withdrew the counts relating to fair market value and requested permission to amend the other counts to add the claim of unequal treatment. At the trial's outset, plaintiff's counsel noted that "we agree that our approach is essentially in regard to the unequal treatment." The referee also recognized that approach and stated that "[t]he theory upon which the plaintiff is proceeding is based on unequal treatment."

"[V]aluation of property in excess of fair market value is not the only ground upon which a taxpayer may be entitled to relief. . . Any circumstances indicating that

a disproportionate share of the tax burden is being thrust upon a taxpayer would warrant judicial intervention." (Citation omitted.) *Chamber of Commerce of Greater Waterbury, Inc.* v. *Waterbury*, 184 Conn. 333, 336, 439 A.2d 1047 (1981). We conclude that the assessor's method resulted in unfair treatment and a wrongful assessment, and, therefore, aggrieved the plaintiff. Once the plaintiff established aggrievement, the court was entitled to exercise broad discretion to correct the assessment. We cannot conclude that the court abused its discretion in adopting the referee's finding that the assessor had improperly failed to apply to the plaintiff's property the methodology used and applied in 1985 to other like properties on Beachside Avenue.

B

We now briefly address the defendant's argument that the plaintiff needed to introduce evidence of fair market value to prevail. Had the plaintiff proceeded strictly under § 12-64, we would find the defendant's argument more persuasive. In light of our discussion in part II A of this opinion, however, because the board's action aggrieved the plaintiff, she was able to proceed under § 12-117a. The defendant accurately notes that the present case is not the usual tax appeal. Appeals from assessments typically attack the assessor's fair market value determination. In those cases, a taxpayer claiming aggrievement must establish the inaccuracy of the assessor's fair market value figure and simultaneously establish the accuracy of her different figure. *New Haven Water Co.* v. *Board of Tax Review*, 166 Conn. 232, 234, 348 A.2d 641 (1974).

In the present case, however, the plaintiff has not argued that the assessor assessed the property in excess of its fair market value. The plaintiff attacks the method used by the assessor in calculating the current assessed value of the larger, merged lot, claiming a wrongful

assessment due to the assessor's unequal treatment of her lot. For that reason, we disagree with the defendant's contention that fair market value was an integral element of the plaintiff's case.

## III

The defendant also asserts that the plaintiff sought an interim revaluation during a nonrevaluation year, which the law forbids. We disagree that the plaintiff's action constitutes a prohibited interim assessment adjustment.

The defendant argues that the law limits interim revaluations in assessed value of real estate to specific extraordinary instances, none of which the facts of this case present. According to the defendant, the plaintiff seeks to reduce the land only assessment because the house that now straddles the boundary line has made subdivision impossible. The defendant maintains that no statutory authority exists to compel the tax assessor to conduct an interim revaluation on the basis of subdivision infeasibility, particularly when the plaintiff herself created the situation.

The plaintiff claims that she has neither requested nor demanded that the assessor conduct an interim revaluation of the subject property and does not claim that fair market value has either increased or decreased. The plaintiff argues, therefore, that the cases and statutes concerning interim revaluations do not apply to the facts of this case. She asserts, instead, that the law allowing an assessment *challenge* to correct an existing and wrongful valuation, rather than the law forbidding a revaluation because of changed market conditions, should apply. Moreover, the plaintiff does not claim that the assessment is manifestly excessive under § 12-119, but challenges, pursuant to § 12-117a, the assessor's valuation on the basis of the method he used. See

*Pauker* v. *Roig*, 232 Conn. 335, 338, 654 A.2d 1233 (1995). We agree with the plaintiff.

General Statutes § 12-64a[20] compels an interim revaluation under the limited circumstance of damage to the property requiring either complete demolition or total reconstruction. The legislature has not provided any other statutory exception, and the Supreme Court has declined to recognize nonstatutory exceptions. *DeSena* v. *Waterbury*, 249 Conn. 63, 82, 731 A.2d 733 (1999). Prior to the *DeSena* decision, certain dictum in *Ralston Purina Co.* v. *Board of Tax Review*, 203 Conn. 425, 525

[20] General Statutes § 12-64a provides: "(a) Whenever a building is so damaged as to require total reconstruction before it may be used for any purpose related to its use prior to such damage and following which, the owner provides for complete demolition of such building with the material from demolition being removed from the parcel of real property on which the building was situated or used as fill on such parcel for purposes of grading, such parcel shall be assessed for purposes of property tax as of the date such demolition, removal and grading are completed, to the satisfaction of the building inspector in the municipality, and such assessment shall reflect a determination of the assessed value of such parcel, exclusive of the value of the building so damaged, demolished and removed. The adjusted assessment shall be applicable with respect to such parcel from the date demolition, removal and grading are completed, as determined by said building inspector, until the first day of October next succeeding and the amount of property tax payable with respect to such parcel for the assessment year in which demolition, removal and grading are completed shall be adjusted accordingly in such manner as determined by the assessor.

"(b) Notwithstanding the provisions of subsection (a) of this section, in the case of a building that sustains fire or weather-related damage that requires the building to be totally reconstructed before it may be used for any purpose related to its use prior to the damage, the assessment reduction shall be calculated from the date of such fire or weather event if the owner, within one hundred twenty days of the fire or weather event, provides for complete demolition of such building with the material from demolition being removed from the parcel of real property on which the building was situated and the parcel graded to the satisfaction of the building inspector in the municipality. If the fire or weather event occurs not more than one hundred twenty days before the next assessment date and the owner provides for such complete demolition, removal and grading to the satisfaction of the building inspector after the next assessment date and not more than one hundred twenty days after the fire or weather event, the assessment for the damaged building shall be removed for such next assessment date."

A.2d 91 (1987), had opened the door to the possibility that a taxpayer could compel an interim revaluation on the basis of special circumstances, such as "destruction or expansion of property, a substantial change in its use or zoning classification, or a decision by the taxpayer to go out of business . . . ." Id., 436. The defendant correctly notes, however, that our Supreme Court firmly shut the door on that argument and unequivocally declined the invitation to recognize the *Ralston Purina Co.* dictum as a judicial exception to the rule that only the limited circumstances provided for by statute compel assessors to conduct interim revaluations. *DeSena* v. *Waterbury*, supra, 87.

In *DeSena*, the plaintiff requested an interim revaluation because he had ceased operation of a nursing home on the property, the property's value had substantially declined and the assessment was greatly excessive, disproportionate and unlawful. Id., 71. The plaintiff in *DeSena* argued that a change in the use of the property, specifically contemplated by the *Ralston Purina Co.* court, entitled him to an interim revaluation. Id., 73. The court rejected the argument and held that § 12-64a prescribed the unique circumstance that would require an interim revaluation. Id., 87.

Although the law prohibits a taxpayer from demanding that the assessor conduct an interim revaluation, the law allows a taxpayer to challenge an illegal assessment. *Jupiter Realty Co.* v. *Board of Tax Review*, 242 Conn. 363, 373, 698 A.2d 312 (1997). In *Jupiter Realty Co.*, as part of the decennial revaluation,[21] the assessor valued the plaintiff's property during 1991. The plaintiff did not appeal from that assessment. In 1992, the assessor determined the assessed value of the plaintiff's property on the basis of the 1991 decennial revalua-

---

[21] Revaluation is now conducted every twelve years. General Statutes § 12-62 (a) (3).

tion. The plaintiff challenged that assessment in 1992, which the board refused to reduce. Our Supreme Court reversed the board's decision and held that boards of tax review were not insulated from appeals from overvaluation during interim years. Id., 372.

The *Jupiter Realty Co.* court drew an "identifiable and justifiable" distinction between "requesting a revaluation because the original revaluation was in error and requesting a revaluation because circumstances subsequent to the initial revaluation have effected a change in the present true and actual value of the property . . . ." Id., 373. The law forbids the latter because it essentially challenges the "legislatively chosen ten year revaluation time period." Id. A change in today's market conditions, resulting in a different "present" true and actual value of the property, is an insufficient basis to compel revaluation. The former, however, constitutes "a challenge to the decennial revaluation in a subsequent year [seeking] only to correct an already existing revaluation. It is a challenge to the manner of taxation; [*Uniroyal, Inc.* v. *Board of Tax Review*, 182 Conn. 619, 629, 438 A.2d 782 (1981)] . . . . We find no support for denying taxpayers the right to have their decennial revaluation reflect the property's true value at the time of the decennial revaluation in our case law concerning interim valuations. While the ultimate relief of interim revaluations and challenges to decennial revaluations might be similar—a lowering of present and future assessment values—the grounds for relief are quite distinct." (Citation omitted.) *Jupiter Realty Co.* v. *Board of Tax Review*, supra, 242 Conn. 373–74.[22]

[22] Although we recognize that *Jupiter Realty Co.* is factually dissimilar to the present case in that the taxpayer in *Jupiter Realty Co.* questioned the original decennial revaluation whereas in this case the taxpayer questions the method the assessor used, a taxpayer may be entitled to relief on grounds other than excess fair market value. See *Chamber of Commerce of Greater Waterbury, Inc.* v. *Waterbury*, supra, 184 Conn. 336.

In the present case, the plaintiff does not claim any intervening change in fair market value since the 1985 valuation year. Although the merger of two lots into one lot is a change, it does not constitute a change in value as discussed in *DeSena*. Here, the assessor used 1985 data to establish the plaintiff's assessment, but did not use the same 1985 methodology he used to assess other similar property. Once the plaintiff merged the two lots into one lot, they ceased to have any independent legal existence. We hold that the plaintiff is entitled to the assessment she would have had in 1985 if the property had then been only one lot and the assessor had used the same method he used for other assessments of similar property, and that the referee's determination of an assessment figure was not improper.

## IV

The defendant's final claim asserts that the court improperly awarded appraisal fees in the amount of $2500. We agree and set aside that part of the court's decision to award fees.

In the present case, the referee's report "recommends that the plaintiff receive compensation for the testimony of [Fugitt] and for preparation of [Fugitt's] reports totaling $2500." The referee arrived at that figure on the basis of two exhibits that the plaintiff introduced at trial. One exhibit, dated March 31, 1998, was Fugitt's bill in the amount of $1100 "for professional services, including preparation of report and court appearance to date." The other exhibit, dated August 12, 1998, was Fugitt's bill in the amount of $1400 for "research and producing report (including meetings to date)."

The defendant accurately points us to *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 674 A.2d 845 (1996), which held that appraisal fees constitute a nonreimbursable cost. The law expects parties to bear their own litigation expenses, except where the

legislature has dictated otherwise by way of statute. *Verrastro* v. *Sivertsen*, 188 Conn. 213, 217, 448 A.2d 1344 (1982). "Costs are the creature of statute . . . and unless the statute clearly provides for them courts cannot tax them." (Internal quotation marks omitted.) Id. Our Supreme Court determined that no existing statute authorized appraisal fee costs. *M. DeMatteo Construction Co.* v. *New London*, supra, 716.

The plaintiff concedes that the court improperly awarded fees for the report, but contends that she is entitled to $1000 for Fugitt's testimony. The plaintiff argues in her brief that "[i]t is submitted that the sum of $1000 be allowed as a cost order for Mr. Fugitt's testimony, based on his statement that his charges, in addition to those set forth on exhibits C and D, which totaled $2500, amounted to $1000." We disagree that Fugitt's statement at trial indicated that his fee for appearing in court was $1000.

We recognize that General Statutes § 52-260 (f)[23] permits costs for a real estate appraiser's testimony. The record in the present case does not contain, however, any indication as to Fugitt's costs for his court appearance. The $1400 bill for preparation of the report constitutes a litigation expense that *M. DeMatteo Construction Co.* requires that the plaintiff bear. Fugitt prepared another bill for $1100 for his services "to date" seven months before he appeared at the November, 1998 trial. That bill also represents a nonreimbursable fee because his November, 1998 court appearance cannot be a service "to date" in March, 1998. The plaintiff refers us to the following portion of the transcript as

---

[23] General Statutes § 52-260 (f) provides in relevant part: "When any . . . real estate appraiser is summoned to give expert testimony in any action or proceeding, the court shall determine a reasonable fee to be paid to the . . . real estate appraiser and taxed as part of the costs in lieu of all other witness fees payable to the . . . real estate appraiser."

support for her argument that she is entitled to $1000 for Fugitt's testimony:

"Q. And Mr. Fugitt, those bills [dated March 31, 1998, and August 12, 1998] do not include subsequent services. Have you estimated what additional charges you're going to make for *the work you've done since then, including your testimony today*?

"A. Yes, it will be approximately $1000." (Emphasis added).

A careful reading reveals that Fugitt did not state that his fee for appearing that day at trial would amount to $1000. The reference to $1000 included subsequent work *and* his testimony. We have no way of ascertaining the amount Fugitt charged only for his testimony. Because the statute explicitly limits reimbursement to testimony fees and there was no evidence at trial to establish that amount, we set aside that portion of the court's judgment awarding expert witness fees.

The judgment is reversed only as to the award of appraisal fees and the case is remanded with direction to vacate that award. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.